Patricio D. SANCHEZ, Appellant,

v.

SOUTHAMPTON CIVIC CLUB, INC., Appellee.

Nos. 14–11–00228–CV, 14–11–00257–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 27, 2012.

Rehearing Overruled May 30, 2012.

---

Paul J. McConnell, III, Ben A. Baring, Jr., Houston, for appellant.

Sandford L. Dow, Houston, for appellee.

Panel consists of Justices BROWN, BOYCE, and McCALLY.

## OPINION

JEFFREY V. BROWN, Justice.

This court withdraws its opinion of March 15, 2012, and issues a corrected opinion in its place to include the number of the consolidated appeal.

I

This is an appeal over the proper interpretation of deed restrictions. The trial court granted a partial summary judgment for appellee Southampton Civic Club, Inc., and denied appellant Patricio D. Sanchez's cross-motion for summary judgment. The trial court also denied Southampton's request for damages under section 202.004 of the Texas Property Code though it did order Sanchez to pay Southampton's attorney's fees. We affirm.

This case concerns the three-foot-wide strip of land between Sanchez's house and the public alleyway behind it. The alleyway itself is eight feet wide and part of an alleyway system established in 1923 in the Southampton Place subdivision in Houston. The trust agreement creating both the subdivision and the alleyway establishes deed restrictions throughout the subdivision. It provides in relevant part:

> Each and every deed or other instrument which may vest in any person or corporation any title or interest in any lot, lots or other property in said project or addition, shall expressly reserve to the Trustee and its successors a right of easement and the right of ingress to a strip of land three (3) feet in width over, along and across the extreme rear end of each and all said lots and tracts. Such easement to be used by the Trustee and its successors and assigns for the laying of gas mains, water mains, storm and sanitary sewer laterals and connections, and electric light poles, telephone poles and other proper or necessary public

utility other than railroad, street railway, and other transportation lines. And this right of easement and use is hereby expressly reserved to the Trustee and its successors in this tract, and when this trust shall have been fully executed and terminated, then such easement and right shall vest in the City of Houston, and it shall have full authority to permit the use of such right-of-way for proper municipal purposes as herein stipulated and no permanent improvements or buildings shall ever be erected thereon which will interfere with the use of said easement for the purposes for which it is reserved.

The alleyway has served residents in myriad ways; for many residents, it is the only route to enter their garages. Most importantly for this appeal, the alleyway has continuously been used for garbage collection throughout the subdivision. The side-loading garbage trucks the City of Houston currently uses are too large to traverse the alleyway, so the city allows Southampton to contract with a private garbage-collection company. The company Southampton has chosen uses eight-foot-wide back-loading garbage trucks with garbage collectors who ride on the back of the trucks and empty residents' garbage directly into the trucks by hand.

In 2007, prompted by the steady accretion of obstructions in the alleyway, Southampton undertook a new enforcement policy regarding residential use of the three-foot tracts of land on either side of the alleyways. It had traditionally allowed residents to encroach into those tracts, but reversed that policy to ensure that garbage collection could continue within the alleyways. Southampton grandfathered in all existing encroachments at that point on the basis that they had been made in good-faith reliance on the old enforcement poli-

cy, but it banned all future construction from the three-foot tracts. Sanchez moved into the subdivision in 2009 and immediately began constructing a new fence within the three-foot tract on his property. After several meetings with Southampton representatives, in which they told him about the 2007 enforcement policy and asked him to stop, Sanchez continued to build the fence.

Southampton sued Sanchez, seeking a permanent injunction ordering him to demolish and remove all parts of the fence and certain elements of his landscaping that encroached on the three-foot tract. Southampton also sought to collect attorney's fees and civil damages under section 202.004 of the Texas Property Code. Sanchez filed a motion to dismiss for lack of standing [1] and a motion for summary judgment. Southampton responded with its own motion for summary judgment. The trial court ruled:

(i) Southampton Civic Club, Inc. has standing to assert the claim in Plaintiff's Original Petition and Application for Permanent Injunction that Patricio D. Sanchez is in violation of the 1923 Restrictions of the Southampton Place subdivision and the alley easement/right of way contained therein and further has standing to enforce the 1923 Restrictions, including the alley easement/rights of way therein;

(ii) Patricio D. Sanchez has violated the 1923 Restrictions of Southampton Place subdivision by erecting a fence and landscaping that intrude into the three-foot (3 §) easement/right of way adjoining the eight-foot (8 §) alley;

(iii) The request of Southampton Civic Club, Inc. for civil damages from

1. Southampton's standing is not at issue in    this appeal.

Patricio D. Sanchez under [section 202.004(c) of] the Texas Property Code is DENIED; and

(iv) Patricio D. Sanchez is hereby ordered to demolish and remove all parts of the fence and landscaping that intrude into the easement/right of way described hereinabove which were constructed or planted by or at the direction of Patricio D. Sanchez behind his residential real property....

The trial court postponed enforcement of its order until after Sanchez had exhausted his appeals, and ordered Sanchez to pay Southampton's attorney's fees. Both parties timely appealed.

## II

### A

We review a trial court's grant of summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex.2004); *Weingarten Realty Mgmt. Co. v. Liberty Mut. Fire Ins. Co.*, 343 S.W.3d 859, 861 (Tex.App.-Houston [14th Dist.] 2011, pet. denied). A movant must establish its right to summary judgment by showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Weingarten Realty*, 343 S.W.3d at 861. We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Joe*, 145 S.W.3d at 157; *Weingarten Realty*, 343 S.W.3d at 861. We review a summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex.2006) (per curiam); *Weingarten Realty*, 343 S.W.3d at 861. When we review cross-motions for summary judgment, we consider both motions and render the judgment that the trial court should have rendered. *Coastal Liquids Transp., L.P. v. Harris Cnty. Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex.2001); *Weingarten Realty*, 343 S.W.3d at 862.

### B

We review a trial court's failure to assess section 202.004 damages under an abuse-of-discretion standard. *See Air Park–Dallas Zoning Comm. v. Crow Billingsley Airpark, Ltd.*, 109 S.W.3d 900, 912 (Tex.App.-Dallas 2003, no pet.). That section of the Property Code provides: "A trial court *may* assess civil damages for the violation of a restrictive covenant in an amount not to exceed $200 for each day of the violation." Tex. Prop.Code § 202.004(c) (emphasis added). Use of the word "may" in a statute creates discretionary authority. Tex. Gov't Code § 311.016(1).

■ We may not conclude that a trial court abused its discretion merely because it committed an error of judgment or if, in the same circumstances, we would have ruled differently. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995). The test is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. *Id.* Instead, a trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985).

### III

The parties presented little evidence in the trial court. This is because, though the parties disagree how the law should apply to the facts of this case, the facts themselves are undisputed.

## A

■ Initially, we note that the language used in the 1923 trust agreement sets out a restrictive covenant, and we reject Sanchez's argument to the contrary. The Texas Property Code defines a restrictive covenant as "any covenant, condition, or restriction contained in a dedicatory instrument, whether mandatory, prohibitive, permissive, or administrative," and it requires that a restrictive covenant "shall be liberally construed to give effect to its purposes and intent." Tex. Prop.Code §§ 202.001(4), 202.003(a).[2]

■ In construing a restrictive covenant, our primary task is to determine the intent of the framers of the covenant. *Oldfield v. City of Houston,* 15 S.W.3d 219, 223 (Tex.App.-Houston [14th Dist.] 2000, pet. denied), *superseded by statute on other grounds as recognized in Truong v. City of Houston,* 99 S.W.3d 204 (Tex.App.-Houston [1st Dist.] 2002, no pet.). In that regard, we must decide whether the restrictive covenant is ambiguous, which is a question of law. *Id.* at 224. If it is unambiguous, then its construction is also a question of law. *Id.* Like any contract, a restrictive covenant is unambiguous as a matter of law if it can be given a definite or certain legal meaning. *Id.*

We think the restrictive covenant is unambiguous. The trust agreement provides that the three-foot tracts are "to be used by the Trustee and its successors and assigns for the laying of gas mains, water mains, storm and sanitary sewer laterals and connections, and electric light poles, telephone poles and other proper or necessary public utility other than railroad,

street railway, and other transportation lines." Relying on longstanding precedent, we hold that garbage collection is a public utility falling within the boundaries of the restrictive covenant at issue. *See Moore v. Logan,* 10 S.W.2d 428, 434 (Tex. Civ.App.-Beaumont 1928, writ dism'd).

> The collection and disposal of garbage in a city is a very important service, as much so as the furnishing of pure and wholesome water or an efficient sewerage system. It requires a vast physical equipment, including an incinerator, all owned and operated by the city, and we think must be held to be a public utility of the city.

*Id.* We find that logic as persuasive today as it was in 1928, five years after the deed restrictions in this case were written. The fact that a private contractor—as opposed to a government agency—is collecting the garbage has no bearing on whether the activity is a public utility. *See City of Wichita Falls v. Kemp Hotel Operating Co.,* 162 S.W.2d 150, 153 (Tex.Civ.App.-Fort Worth 1942), *aff'd,* 141 Tex. 90, 170 S.W.2d 217 (Tex.1943) ("It is the public service of ridding premises of waste and equipment used in connection therewith which constitute the public utility.").

## B

■ Sanchez relies on a decision from an Oklahoma court of appeals to argue that, even if garbage collection is a public utility, it is not the type of public utility that the drafters of the trust agreement contemplated. *See City of Elk City v. Coffey,* 562 P.2d 160 (Okla.Civ.App.1977). Though decisions from other jurisdictions are certainly not determinative, we may

---

**2.** This is consistent with a 1984 decision from the First Court of Appeals considering the very same deed restrictions. *See Finkelstein v. Southampton Civic Club,* 675 S.W.2d 271 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). The nature of the deed restrictions was not at issue in *Finkelstein,* but the defendants in the case acknowledged they were "parties to and beneficiaries of the restrictive covenants imposed on all residential lots in the subdivision." *Id.* at 275.

recognize them as persuasive. *See Transport Ins. Co. v. Polk,* 388 S.W.2d 474, 476 (Tex.Civ.App.-Fort Worth 1965), *aff'd,* 400 S.W.2d 881 (Tex.1966); *see also Mauzy v. Legislative Redistricting Bd.,* 471 S.W.2d 570, 573 (Tex.1971) (cases from other jurisdictions are merely persuasive and not determinative even when facts are almost identical). However, we find the facts in *Coffey* distinguishable from those here.

In *Coffey,* the relevant instrument provided:

> We further certify that we have caused said real-estate to be surveyed into lots, blocks, avenues, alleys, and utility easements and have caused a plat to be made of said tract, showing dimensions of said lots, building lines, alleys, utility easements, and streets, we hereby designate said tract as 'Roberts Addition' to the City of Elk City, Oklahoma, and hereby dedicate for public use all the streets and alleys within said 'Roberts Addition' and reserve *for installation and maintenance of utilities* the easements shown on said plat which is hereto attached.

*Coffey,* 562 P.2d at 161–62 (emphasis added). Elk City sought to use the easement as a thoroughfare for its garbage trucks. *Id.* at 162. The court held that this was an impermissible use of the easement because the easement was "restricted to utilities which can be installed and which may require maintenance." *Id.* at 163.

*Coffey* is distinguishable from this case. The trust agreement in this case reserves the three-foot tracts "for the laying of gas mains, water mains, storm and sanitary sewer laterals and connections, and electric light poles, telephone poles and other proper or necessary public utility." The limitations on the easement thus fall into three categories. First, the easement may be used "for the laying of gas mains, water mains, storm and sanitary sewer laterals

and connections." Second, the easement may also be sued for "electric light poles, telephone poles and other proper or necessary public utility." The third category lists the utilities for which the easement may *not* be used: "railroad, street railway, and other transportation lines."

■ Sanchez correctly points out that "the laying of" is functionally equivalent to "the installation of," as used in *Coffey.* But not all of the uses provided for in the trust agreement can be laid. Gas mains, water mains, and storm and sanitary sewer laterals and connections are laid, but electric light poles and telephone poles are not laid—they are erected. So the trust agreement does not restrict the easement to public utilities that can be laid. Instead, it unambiguously sets broad limits on the utilities which may use the easement, excluding only "railroad, street railway, and other transportation lines." It is not evident that the trust agreement's framers intended any constraint similar to *Coffey's* installation restriction.

We conclude that the subdivision's garbage collection is a proper public-utility use of the three-foot tract.

### C

■ Likewise, we conclude that Sanchez's fence and landscaping violate the trust agreement's deed restrictions. It is undisputed that the garbage trucks used in the subdivision are eight-feet wide—the same width as the alleyway. It is also undisputed that, without the adjoining three-foot tracts on either side of the alleyway, the garbage trucks would have difficulty passing through the alleyways and the garbage collectors would be unable to move alongside the trucks. Finally, it is undisputed that Sanchez's fence and landscaping encroach on the three-foot tract at the rear of his property designated for

public-utility use in the 1923 trust agreement.

Southampton need not show anything else to prove Sanchez has violated the deed restrictions. The restrictions set out that "no permanent improvements or buildings shall ever be erected [on the three-foot strip of land at issue] which will interfere with the use of said easement for the purposes for which it is reserved." Sanchez's fence and landscaping are permanent improvements which interfere with garbage collection in the subdivision. It is immaterial that the record contains no affidavits from the City of Houston alleging such interference. The city has delegated oversight of garbage collection to Southampton, and Southampton alleges interference—as do several residents of the subdivision—in affidavits filed in the trial court. Sanchez's only response to such allegations is that garbage collection continues to occur twice weekly throughout the subdivision. But just because garbage collection occurs despite the encroachment does not mean the encroachment is no interference.

We hold that the trial court correctly determined that Sanchez has violated the deed restrictions. We also affirm the trial court's award of attorney's fees to Southampton. Sanchez's sole argument against the award is that the underlying judgment was erroneous. *See* Tex. Prop.Code § 5.006(a) (mandating that courts award reasonable attorney's fees to the prevailing party in actions for breach of a restrictive covenant pertaining to real property). Because we conclude the underlying judgment was correct, we affirm the award of attorney's fees.

### D

Now we turn to the trial court's refusal to assess civil damages. Damages assessed under section 202.004 of the Property Code are unrelated to the type or extent of injury or harm caused by the violation. *Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 937 (Tex.App.-Houston [1st Dist.] 2010, no pet.). As a result, section 202.004 damages are punitive rather than compensatory. *Id.* Southampton argues that the only guiding principle permissible for the trial court to consider was the conduct of the parties. We agree, but we think the record supports the trial court's refusal to award damages.

Most notably, the trial court could have determined that Sanchez was acting in good faith when he violated the deed restrictions and participated in this litigation. In *Uptegraph*, one of the trial court's findings was essential to its award of damages under section 202.004: "Defendants knowingly, intentionally and deliberately disregarded the restrictive covenants in constructing the fence in issue." *Id.* at 936. There is no such finding in this case. Sanchez did ignore Southampton's allegations that he was in violation of the deed restrictions, but there is no indication he knew his action violated the deed restrictions and did it anyway. In fact, his entire argument on appeal is that Southampton's allegations were unfounded and the deed restrictions do not apply to the improvements he made on his property. As a result, we find no abuse of discretion in the trial court's refusal to assess civil damages.

\*      \*      \*

For the foregoing reasons, we affirm the judgment below.

McCALLY, J., dissenting.

SHARON McCALLY, Justice, dissenting.

This court withdraws its opinion of March 15, 2012, and issues a corrected opinion in its place to include the number of the consolidated appeal.

The majority affirms the trial court's summary judgment in this deed-restriction case, holding that Sanchez violated those restrictions when he built a fence on his property within the utility easement because Southampton's garbage collection is a proper use of the three-foot utility easement. I respectfully disagree for two reasons as outlined below.

## BACKGROUND

The following undisputed facts arise from the summary judgment evidence:

- Since the time of the original Southampton Place plat, the City of Houston has owned an eight-foot alley that runs behind Sanchez's home.
- Since the 1923 restrictions at issue, a three-foot wide easement has existed on either side of the alley.
- The plain language of the restriction states the easement purpose:

  **Such easement to be used by the Trustee and its successors and assigns for the laying of gas mains, water mains, storm and sanitary sewer laterals and connections, and electric light poles, telephone poles and other proper or necessary public utility other than railroad, street railway, and other transportation lines.**[1]

- The plain language of the restriction further provides that **"no permanent improvements or buildings shall ever be erected thereon which will interfere with the use of said easement for the purposes for which it is reserved."**[2]

- Until 2007, Southampton residents freely obstructed the three-foot easement in ways that prevented driving on the easement.

- The three-foot easement also contains, *inter alia,* utility poles that have been erected on the edge of the utility easement—that is, the eight-foot line.
- Garbage trucks servicing Southampton residents via the eight-foot alley over the years have become larger.
- Currently, the average City garbage truck is eight feet wide, wheel hub to wheel hub.
- Because of their size, these City garbage trucks were forced to weave in and out of the utility easements to avoid the utility poles and service meters.
- Several of the utility poles in the subject alley have notches "where the top edges of trucks collide with the poles."
- "The narrow alleys have been a cause of two near-disastrous ruptures of utility gas lines to alley meters."
- The City of Houston refused to provide further alley-garbage service to Southampton in 1990 because the alley was not wide enough.
- Therefore, Southampton began subcontracted garbage service, using smaller trucks, at a per-resident cost of $185.00; but these trucks still struggle with the alley width.
- Southampton has continued to collect garbage via the eight-foot alley despite not only the current resident obstructions, but also the Southwestern Bell/Center Point utility poles "on the actual edge of the eight-foot alley right of way rather than inside the 3–foot easement at the fourteen-foot line." It is current pole placement that has led to "chronic, extensive damage to poles."
- In 2004, Southampton even urged a need for an alley setback amendment

---

1. Emphasis supplied.

2. Emphasis supplied.

to the City's development ordinance. In that letter, Southampton acknowledged that "our neighborhood was developed in the 1920's and its alleys were developed in light of vehicle access anticipated at that time."

- Southampton implemented a new policy in late 2007 to prevent future resident-initiated utility-easement obstructions and to phase out such existing utility-easement obstructions.
- Sanchez, a resident, ignored the policy and built a fence on the utility easement.

## ANALYSIS

### I. *I disagree that there is any evidence, let alone conclusive evidence, that Sanchez violated the unambiguous restriction because he has not actually interfered with use of the easement for the purpose reserved.*

The trial court determined that Sanchez "has violated the 1923 Restrictions of Southampton Place subdivision by erecting a fence and landscaping that **intrude** into the three-foot (3') easement/right of way adjoining the eight-foot (8') alley."[3] The majority concludes that the restrictions unambiguously permit garbage collection, as a public utility, to use the easement. However, even assuming garbage collection to be a purpose of the easement, there is no evidence that *Sanchez's fence* will interfere with the use of the easement for the purposes for which it is reserved, as required by the restriction.[4] The undisputed evidence is that Sanchez's fence is within the three-foot easement along with more than fifty years of other fences, gas meters, and utility poles that prevent a garbage truck from driving unimpeded down the alley. In fact, appellee admits that it is Southampton's "new enforcement policy" that Sanchez violated; that policy forbids all encroachments, not just those that interfere.[5]

This undisputed evidence includes an affidavit from Evalyn Krudy, former Manager/Executive Director of the Southampton Civil Club, Inc., who states that "[t]he construction of permanent fences and other obstructions in the three-foot strips that comprise part of the alleyway system interferes with the use of the alleyway system for the collection of garbage and other public utility functions.... Each obstruction—each interference—functions to make it increasingly more difficult for the neighborhood to use the alleyway system for its intended public utility purposes and sets the stage for future total blockage of the alleys." It is not Sanchez's fence that interferes—it is the "permanent fences and other obstructions."

---

**3.** Emphasis supplied. The court never finds there is interference—only intrusion.

**4.** Appellee cites *Sheppard v. City and County Dallas Levee Improvement District*, 112 S.W.2d 253 (Tex.Civ.App.-Dallas 1937, no writ), to suggest actual interference is not necessary. *Sheppard* does not support that proposition. In *Sheppard*, the defendant presented evidence that Sheppard's two iron sheds and a post and wire fence actually interfered with the levee easement because Sheppard "eradicated the Bermuda grass and dug postholes in the side of the levee," which made the levee susceptible to slides and erosion. *Id.* at 255.

**5.** In its response to Sanchez's motion for summary judgment, appellee stated that "Sanchez's intentional enclosure of part of the easement/right of way behind his residence at 2001 Sunset Boulevard, Houston, Texas, squarely presents the issue: Will Southampton's alleys by preserved? This issue is before the court with perfect clarity because Sanchez proceeded intentionally, with actual knowledge that he encroached, with express notice of the Civic Club policy that no new encroachments would be permitted, and even with *notice of the Civic Club's* concern that non-enforcement would eventually lead to loss of the alley access."

The obstructions Krudy speaks of are not new. Lee Duggan, a former appellate justice and a former Southampton resident, recollects in his affidavit that even at the time he lived in Southampton from 1934 to 1960, garbage trucks "needed to steer around utility structures in the alleys such as utility poles and gas meters, as well as to avoid hitting the garbage cans placed in the easements." Thus, these obstructions predate Sanchez's fence by more than fifty years.

Southampton acknowledged the crisis of these obstructions at least as early as 2004. In a September 8, 2004 letter to Mayor Bill White, Hugh Rice Kelly, chair of the Southampton Alley Taskforce, "urgently" proposed adoption of a "new section to the development ordinance" that "would prohibit construction of any new obstructions within the flanking easements, including fences, high curbs, landscaping and anything else that could impede free use of the alley by large vehicles." The proposal included a request "that utilities be required to move their facilities to maximize clearance" including Southwestern Bell/Center Point utility poles "on the actual edge of the eight-foot alley right of way rather than inside the three-foot easement at the fourteen-foot line."[6] Thus, this urgent need in 2004, created by residents and utilities alike, predates Sanchez's fence by approximately five years.

Southampton ultimately created a solution to the alley obstruction problem. John Thompson, the 2010 President of the Southampton Civic Club, testified that, due to a growing number of easement encroachments, the board adopted a "new alley enforcement policy to prohibit any new, permanent encroachments into the 3–foot easement/right-of-ways." The Board determined, however, that "encroachments existing before December 2007 were grandfathered" such that they did not need to be removed.[7]

On this undisputed record, Sanchez's fence does not and could not interfere with garbage collection until and unless the other obstructions are removed. Stated differently, with or without the Sanchez fence, a garbage truck cannot currently drive down the Southampton alley without weaving around, and occasionally hitting, utility poles and gas meters. The interference, if any, has existed for well over fifty years. As such, the trial court erred in determining that Sanchez violated the express language of the deed restrictions as a matter of law. I would reverse on this point alone.

## II.  I disagree that the unambiguous "purposes for which [the 1923 easement] is reserved" includes a road for vehicular traffic.

What is not at issue in this case is the original 1924 dedication of an 8–foot alley

---

6. The record suggests, though it is not entirely clear, that the City rejected this proposal.

7. Because the majority concludes, and I concur, that the restrictions are unambiguous, there is no need to reach any question about the Southampton Board of Directors' exercise of "statutory discretion" to adopt the new enforcement policy. Were we to reach this question, however, such enforcement policy would, in my opinion, be vulnerable as arbitrary, capricious, or discriminatory in violation of section 202.004(a) of the Texas Proper-

ty Code inasmuch as Southampton residents are arbitrarily treated differently (grandfathering) and are singled out for enforcement of a Southampton policy that cannot accomplish its purpose without the myriad utility companies moving the very obstruction specifically mentioned in the easement grant. *But cf. Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 933–34 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (holding that civic club's disparate treatment of lot owners' request for variance did not establish arbitrary, capricious, or discriminatory enforcement).

running behind the property at issue. Our assignment is to determine the scope of the easement rights conveyed. The majority concludes that garbage collection is a purpose for which the easement was reserved. In my opinion, this conclusion is either immaterial to the dispute or insufficient to support the ultimate disposition. Appellee sought summary judgment that the easement includes "the collection of garbage, **and that the garbage collection function may be achieved using the adjoining three-foot strips to accommodate the reasonably necessary vehicular traffic involved in such activity....**"[8] Thus, the issue is whether the purposes for which the easement is reserved includes use of the three-foot easement *as a road* for garbage trucks collecting garbage and, more specifically, whether the "roadway" right is implied by the above provision.

We know that there is no express grant for use of the easement as a road—the words "road" and "street" do not appear in the grant. Use of the phrase "right-of-way" does not mean road; rather it means nothing more than a "right of passage." *See Lakeside Launches, Inc. v. Austin Yacht Club, Inc.*, 750 S.W.2d 868, 871 (Tex. App.-Austin 1988, writ denied). Thus, a right-of-way may or may not be a road. Likewise, use of the phrase "right of ingress" does not express a grant for a road as a matter of law. *See Arden v. Boone*, 221 S.W. 265, 266 (Tex. Comm'n App.1920, judgm't approved) (holding that whether an easement affords a right to a roadway free from gates and bars depends upon the terms of the grant, its purpose, the nature and situation of the property, and the manner in which it is used); *see also Ferrara v. Moore*, 318 S.W.3d 487, 491–92 (Tex. App.-Texarkana 2010, pet. denied) (holding that easement language "non-exclusive right-of-way for purposes of ingress and

egress between a public road and the tract conveyed" prohibited fencing that denied access); *Gerstner v. Wilhelm*, 584 S.W.2d 955, 958 (Tex.Civ.App.-Austin 1979, writ dism'd) (holding that easement language "free and uninterrupted use, liberty and easement of passing" prohibited fencing); *Hillburn v. Providian Holdings, Inc.*, No. 01–06–00961–CV, 2008 WL 4836840, at *4–6 (Tex.App.-Houston [1st Dist.] Nov. 6, 2008, no pet.) (mem. op.) (holding that easement language "providing free and uninterrupted pedestrian and vehicular ingress to and egress from the Dominant Estate property" prohibited fencing that denied access). The cited authorities show that fencing is not necessarily prohibited even on **uninterrupted** ingress/egress easements. At best, we would need to imply the term "uninterrupted" to the easement grant. *See Barrow v. Pickett*, No. 01–06–00664–CV, 2007 WL 3293712, at *3 (Tex.App.-Houston [1st Dist.] Nov. 8, 2007, no pet.) (mem. op.) (holding that to construe right of ingress and egress as affording unrestricted access would require the court to read "free and uninterrupted" into the four corners of the document). A grant to the "right of ingress" may or may not be a road.

Thus, for the easement conveyed to include a right to use it as a road for garbage collection, this Court must find such a right implied in the text. We are forbidden to imply rights by the easement unless such rights are reasonably necessary to fairly enjoy the rights expressly granted in the easement. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 701 (Tex.2002); *see id.* at 707 (holding that an easement for "an electric transmission or distribution line or system" does not allow the easement to be used for cable-television lines). In short, "if a particular purpose is not provided for in [a] grant, a use pursuing that purpose is not allowed." *Id.* at 701.

8. Emphasis supplied.

Giving care in construing easements makes good policy sense. "A property owner's right to exclude others from his or her property is recognized as one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Id.* at 700 (internal quotations omitted) (citing *Dolan v. City of Tigard,* 512 U.S. 374, 387, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 433, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). There is no doubt that a landowner may choose to relinquish a portion of the right to exclude by granting an easement, but such a relinquishment is limited in nature. *Id.* And, because the easement is a nonpossessory interest, it authorizes the holder to use the property for only particular purposes. *Id.* (citing RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.2 cmt. d.). Most important, an easement owner must make a reasonable use of the right so as not to unreasonably interfere with the property rights of the servient estate. *See San Jacinto Sand Co. v. Sw. Bell Tel. Co.,* 426 S.W.2d 338, 345 (Tex.Civ.App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.).

As outlined above, the stated purpose of the easement grant is: "laying of gas mains, water mains, storm and sanitary sewer laterals and connections, and electric light poles, telephone poles and other proper or necessary public utility other than railroad, street railway, and other transportation lines." In construing the covenant, the primary task is to determine the intent of the framers. *Oldfield v. City of Houston,* 15 S.W.3d 219, 223–24 (Tex. App.-Houston [14th Dist.] 2000, pet. denied) (citing *Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A.,* 956 S.W.2d 749, 752 (Tex.App.-Houston [14th Dist.] 1997, pet. denied)).

Contract-construction rules require that we consider the entire document to harmonize and give effect to all provisions of the contract so that none are meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex. 2006). Thus, for example, we must also consider and harmonize the further provision that "no permanent improvements or buildings shall ever be erected thereon which will interfere with the use of said easement for the purposes for which it is reserved." However, appellee's construction fails this principle. If the easement is intended as a vehicular roadway, the "interfere" provision is meaningless. In fact, the "new enforcement policy" of Southampton makes this point crystal clear; the policy forbids **any encroachments** because Southampton wants the easement as a road.

Another "long-established" contract-construction rule is that "'[n]o one phase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions.'" *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994) (quoting *Guardian Trust Co. v. Bauereisen,* 132 Tex. 396, 121 S.W.2d 579, 583 (1938)). Yet, that is precisely what the majority and appellee do. They isolate the phrase "other proper or necessary public utility" from the remainder of the sentence to conclude that the implicit intent is that public utilities use the easement in any way they need it. Removing this phrase from its context allows a construction that ignores that all other purposes specifically mentioned are "laying" purposes; the word "laying" modifies every other specific purpose in the enumerated series. Moreover, the exclusionary phrase that follows the "laying" purposes forbids "transportation line" purposes. As such, in context, there is no implied right to vehicular traffic over this three-foot easement. Therefore, the trial

court erred in determining that Sanchez violated the deed restrictions as a matter of law. I would reverse on this independent point as well.

## CONCLUSION

If this case were about whether the Southampton alley needs to be wider, the analysis would be simple and the answer would be "yes." If Texas law authorized this Court to place the needs of the many Southampton residents[9] over the desires of one Southampton resident, the analysis would, again, be simple and Sanchez would need to yield. But, the Texas Supreme Court forbids consideration of "important public policies" that disturb the contracting parties' intent. *See Marcus Cable Assocs., L.P.*, 90 S.W.3d at 702.

The easements are for the stated purpose of laying, among others, utility poles; vehicles cannot drive through utility poles. The easements are for the purpose of laying, among others, service meters; a vehicle cannot drive through the service meters. These utilities fulfill the express purpose of the easements and, therefore, they foreclose an interpretation that the framers intended vehicular traffic, even vehicular traffic for a municipal purpose. Therefore, under accepted principles of contract construction which govern here, the proper municipal purposes cannot include vehicular traffic.

Because the easement grant did not contemplate or intend vehicular traffic and because the easement language did not forbid all "intrusions" into the three-foot easement, this record does not support the conclusion that Sanchez violated the deed restrictions as a matter of law.

For at least ten years, the Southampton Civic Club has tried to find a solution to its inadequate-alley problem. The passage of time and the increasing girth of not just garbage trucks, but all vehicles, exacerbate the problem. However, the passage of time has changed neither the express language nor the intent of the 1923 easement. We cannot and should not engage in a strained contract interpretation to achieve an admirable result on an unassigned task.

---

9. Southampton alleges, and Sanchez does not refute, that many residents may only access their property from the alley and that "mil-lions of dollars are presently invested in garbage-collection, garages, and other improvements accessible only from the alleys."